# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 6, 2013 Session

## STATE OF TENNESSEE v. KEN PARKER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-08167     W. Mark Ward, Judge**

**No. W2012-00827-CCA-R3-CD  - Filed January 17, 2014**

A Shelby County Grand Jury returned an indictment against Defendant, Ken Parker, charging him with first degree murder and attempted second degree murder. Following a jury trial, Defendant was convicted of facilitation of first degree murder and attempted second degree murder.  The trial court imposed a sentence of twenty years for facilitation of first degree murder and ten years for attempted second degree murder with the sentences to be served concurrently with each other and consecutively to a life sentence that Defendant had received in a separate case.  On appeal, Defendant argues: (1) that the evidence was insufficient to support his convictions; (2) that the trial court erred in admitting evidence of certain writings and drawings found on Defendant's person and in his backpack at the time of his arrest; and (3) that the trial court erred by not requiring the State to elect which facts it relied upon to establish the offense of attempted second degree murder.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, (on appeal) and Larry Copeland, Memphis, Tennessee, (at trial) for the appellant, Ken Parker.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; Paul Hagerman, Assistant District Attorney General; and Robert Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

The evidence at trial revealed that this criminal incident was a direct result of animosity between the "Bloods" and the "Crips" gangs in Shelby County. On the night of September 14, 2009, Chauncey Partee (the victim) , who was a member of the "Raymond Avenue" Crips gang, and Mardreaus Kizer, a "Hoover" Crips gang member, left a residence on Lucy Avenue with the plan to purchase marijuana. They walked around the corner, and "[t]he dude [dealer] wasn't there though so [they] went to the store." The victim and Mr. Kizer walked to the Shell Gas Station and purchased a "blunt" or "nickel bag" of marijuana, which was approximately one gram, from a dealer for $5.00. They began walking down Simpson Avenue on their way back to the residence on Lucy Avenue when they met Defendant and Derek Taylor, who were both members of the "Bloods" gang, walking toward them. Defendant asked the victim and Mr. Kizer if they had any marijuana. They stopped, and told Defendant and Mr. Taylor that they had just purchased some marijuana from "the dude at the store." Defendant then asked Mr. Kizer if they could smell the marijuana. Mr. Kizer opened his hand, and Defendant leaned over and smelled the substance. At that point, Mr. Taylor pulled out a gun and shot the victim in the head. Mr. Kizer began running away and heard three additional shots. He then "fell and hit the ground." Defendant and Mr. Taylor walked up and stood over Mr. Kizer. As they stood there, Mr. Taylor had the gun pointed at Mr. Kizer, and Defendant put his hand on Mr. Taylor and told him several times to shoot Mr. Kizer. Mr. Kizer testified on direct examination that he did not hear "any clicking of the gun or anything like that." However, on cross-examination, he said that Mr. Taylor pulled the trigger one time in an attempt to shoot him but the weapon apparently misfired. Mr. Kizer then "hopped up and ran." He did not hear any further shots fired.

Mr. Kizer ran to the gas station and called for an ambulance. He also flagged down a police car and told the officers what happened. One of the officers, Jeramy Cline, got out of the car and ran back to the scene with Mr. Kizer. The other officer, Arjang Ehsan, drove to the scene. When they arrived, the victim was lying face down on the road. There was a pool of blood, and the victim was not moving and appeared to be deceased. The victim was then transported to the hospital by ambulance. Mr. Kizer gave a statement to police and went to the hospital where he learned that the victim had died. According to the autopsy report the barrel of the gun was between six and eighteen inches from the victim's head when it was fired. The bullet was recovered from the victim's head.

Sergeant Mundy Quinn of the Memphis Police Department, Homicide Bureau, developed Defendant as a suspect in the shooting and obtained a surveillance video from the

Shell Gas Station located at Patton Street and McLemore Avenue. He was able to print a still photo from the surveillance video, and he provided it to Sergeant Freeman, the case coordinator, for placement in a photo lineup. Mr. Kizer identified Defendant from the photographic lineup. He also identified Derek Taylor from another photographic lineup.

On September 15, 2009, Officer Tim Reynolds of the Memphis Police Department's Organized Crime Unit located Defendant at the Booker T. Washington School and took him into custody. He searched Defendant and found a handwritten note in his pocket which read: "What you say to a n - - - - r if he had . . . I tell them Blood and I hit them with some hollow tips, hit you from your chest up if you disrespecting us I hit you from you chest up. I hit you with some shit and - - [.]" Officer Reynolds was unable to decipher some of the note. He said that it contained the word "Crip," but the C had a line through it. The back of the note contained the words "Crenshaw Mafia, Vaness Gangsters, Long Beach Rolling Twenties, Bounty Hunters, Athens," and "Piru." Officer Reynolds noted that Piru is a "Bloods" gang organization.

Officer Reynolds also retrieved some items from Defendant's backpack. On the back of a notebook was a drawing of a skull with a CK on it, which Officer Reynolds recognized as "Crip Killer." The bottom of the drawing indicated that the drawing was done "[b]y Ken." Officer Reynolds read the following found written on a list of Defendant's classes into evidence, "You know, he identifies himself as a Crip, I tell them I'm a Blood and hit him with some hollow tips." There were also gang references on another notebook from Defendant's backpack. The last thing Officer Reynolds found in a spiral notebook was the following:

> What you say to a n - - - - r if he holler Crip, I tell them Blood and I hit them with a hollow tip. He holler Crip, I shot him with some hollow tips. I sunk his ship and made his whole body flip, but bitch n - - - - rs they get a whole lot of lip, but if you get caught slipping then you outta here. One shot to the dome - - [    ] - - he ain't coming back, blood rushing out of his head, how you like that."

Officer Reynolds took Defendant directly to the Homicide Bureau and released him to one of the homicide investigators.

Sergeant Quinn advised Defendant of his *Miranda* rights, and Defendant signed the Advice of Rights form indicating that he wished to talk. Sergeant Quinn advised Defendant that he was investigating a homicide. He gave Defendant the location of the offense, and Defendant said that he had no knowledge of the homicide. Sergeant Quinn showed Defendant the photo that he took from the surveillance video, and Defendant said that it did not "prove anything." He admitted that he was in the "Denver Lane Blood" gang. Defendant later told

Sergeant Quinn that he knew the location of the gun which was used to kill the victim. He admitted that he hid the weapon in the backyard of his residence along the fence. Sergeant Quinn and Sergeant Lundy traveled to the residence located at 637 Stephens Place and spoke with Defendant's mother. She gave them permission to search the premises and accompanied the officers to the backyard where they walked the fence line, and Sergeant Quinn found the firearm under a tire wrapped in a piece of white notebook paper. He then notified the Crime Scene Unit. Officer Hope Smith collected the weapon found at Defendant's residence. The gun was loaded and wrapped in notebook paper that had gang-related writing on it. The gun and the bullet recovered from the victim's body were sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for testing.

Special Agent Cervinia Braswell of the TBI Firearms Identification Unit examined a Smith and Wesson .38 caliber revolver, one bullet, and five cartridges involved in the present case. She determined that the bullet recovered from the victim's body was fired from the .38 caliber revolver found at Defendant's residence.

Officer Arjang Ehsan of the Memphis Police Department testified that he was a former reserve deputy with the Los Angeles County Sheriff's Department and was a member of the California Gang Investigators Association. He had also taken a "forty [-] hour course on basic gangs with the Tennessee Gang Investigators Association." Officer Ehsan testified that he spoke with Mr. Kizer on the night of the shooting and noticed that he had a tattoo on one of his hands that read "VER/83rd." Based on his training and experience, Officer Ehsan recognized the tattoo as "a gang related tattoo which would be a Los Angeles based gang," indicating a subsection of the Crips gang. Officer Ehsan noted that there had been traditional animosity between the Bloods and the Crips. He also testified that the main rivals of the Denver Lane Bloods was the Raymond Avenue Crips. Officer Ehsan noted that a tattoo located on the victim, "RCG," indicated that the victim was a member of the Raymond Avenue Crips. Officer Ehsan testified that the "CK" found on drawings taken from Defendant at the time of his arrest stood for "Crip Killer." He noted that one of the drawings was a picture of a crab, which was crossed out. Officer Ehsan testified that "crab" was a derogatory term that the Bloods used toward the Crips. He noted that the term was very disrespectful to the point that it could cause someone to be assaulted or killed. Officer Ehsan testified that the drawing of the crab crossed out indicated "Crab Killer" or "Crip Killer."

## II. Analysis

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence for his convictions of facilitation of first degree murder and attempted second degree murder. When an accused challenges the

sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

First degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Facilitation is established by proof that the accused knew another person intended to commit a specific felony and knowingly furnished substantial assistance in the commission of the felony. Id. § 39-11-403(a). Therefore, the State was required to prove the commission of a specified felony and the assistance the defendant gave to the person committing the specified felony. *State v. Parker*, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996).

Second degree murder is defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." *Id*. § 39-12-101(a)(3). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" *Id*. A person is criminally responsible for an offense committed by the conduct of another if:

> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402.

Viewing the evidence in a light most favorable to the State, the proof showed that on the night of September 14, 2009, the victim and Mardreaus Kizer, who were "Crips" gang members, were walking down Simpson Avenue with a "nickel bag" of marijuana that they had just purchased when they encountered Defendant and Derek Taylor who were members of the rival "Bloods" gang. Defendant asked the victim and Mr. Kizer if they had any marijuana. They stopped and told Defendant and Mr. Taylor that they had just purchased some from the "dude at the store." Defendant asked Mr. Kizer if he could smell the marijuana, and when Defendant leaned over to smell it in Mr. Kizer's hand Mr. Taylor pulled out a gun and shot the murder victim in the head. Mr. Kizer began running away, and he heard three additional shots fired. He then fell to the ground as he was running, and Defendant and Mr. Taylor walked up and stood over him as he lay on the ground. Mr. Taylor had the gun pointed at Mr. Kizer, and Defendant placed his hand on Mr. Taylor and told him several times to shoot Mr. Kizer.

During his trial testimony on direct examination, Mr. Kizer testified that the gun "didn't go off so I hopped up and ran." He did not hear anything, such as the "clicking" of the gun as he ran. On cross-examination, Mr. Kizer testified that Mr. Taylor did not pull the trigger, and "they" did not do anything after he fell and that he got up and ran away. However, the following exchange then took place at trial between Mr. Kizer and defense counsel:

[Defense Counsel]: How many times was that trigger pulled on the gun after they said shoot him cuz, shoot him cuz?

[Mr. Kizer]: Once, sir.

[Defense Counsel]: One? Well, that's the first time I've heard that answer. You remember giving that statement, right? Sir?

[Mr. Kizer]: Yes, sir.

-6-

[Defense Counsel]:   You remember being asked that question "When you were on the ground did the suspect pull the trigger on the weapon and intend to shoot you?"

[Mr. Kizer]:   No, I don't remember.

[Defense Counsel]:   You don't remember your answer?

[Mr. Kizer]:   No, it's been two years ago, sir.

[Defense Counsel]:   Fair enough.

\*     \*     \*

[Defense Counsel]:   Do you remember being asked that question?

[Mr. Kizer]:   No, sir.

[Defense Counsel]:   You don't remember being asked when you were on the ground did the suspect pull the trigger on the weapon and attempt to shoot you?

[Mr. Kizer]:   No, sir.

[Defense Counsel]:   And your answer being "no, sir, I didn't hear no clicking noise."

[Mr. Kizer]:   No.

[Defense Counsel]:   You don't know.

[Mr. Kizer]:   Huh-uh, I don't remember.

\*     \*     \*

[Defense Counsel]:   And how much time passed between the giving of this statement and the incident that we're here for today? Two or three hours?

[Mr. Kizer]:   Yes, sir.

[Defense Counsel]: And if I may Mr. Kizer, direct you to this question here, would you mind reading that question and the answer you gave three hours after the event back then on September 15th at 1:17 A.M.?

[Mr. Kizer]: [Reads from his statement]: "While you were on the ground did the suspect pull the trigger on the weapon and attempt to shoot you?" Q So three hours after the event there was no weapon being triggered, was there? The gun was never shot at you, was it, after you were on the ground?

[Mr. Kizer]: Yes, it was.

[Defense Counsel]: When you were on the ground?

[Mr. Kizer]: No, it wasn't fired, no.

[Defense Counsel]: Nobody pulled the trigger, didn't hear no clicking noise, you got up and ran to get help, nobody tried to stop you, nobody ran after you, nobody tried to tackle you to keep you from going anywhere, did they?

[Mr. Kizer]: No, sir.

After the shooting, Defendant took the gun from Mr. Taylor and hid it under a tire in the backyard of his house. Defendant was taken into custody the following day. There was a handwritten note in Defendant's pocket containing rap lyrics about killing members of the Crips gang and there were drawings in a notebook in Defendant's backpack, several of which contained the letters "CK," which according to Officer Ehsan stood for "Crip Killer." The bottom of one drawings indicated that the drawing was done "[b]y Ken." There were also gang references on a list of Defendant's classes. One particular set of lyrics found in a spiral notebook in Defendant's backpack contained the following which can be inferred to be in reference to the shooting:

A what you say to a n - - - a [if] he holler crip[,] I tell em blood and I hit em wit them hollow tips[.] He holla crip [.] I hit em wit them hollow tips[.] I sunk his ship and made his whole body flip[.] But bitch n - - - as they get a whole lot of lip[.] But if u get caught slippin then you out of here[.] One shot to the dome, he ain't comin back[.] BLOOD rushin out his head how you like that[.]

Defendant later told police where he hid the weapon. When officers recovered the gun, it was wrapped in a piece of notebook paper containing gang-related drawings and rap lyrics similar to those in Defendant's possession at the time of his arrest.

In support of Defendant's conviction for facilitation of first degree murder, the proof demonstrates that Defendant knew Mr. Taylor was going to commit first degree murder, and Defendant furnished substantial assistance to Mr. Taylor in committing the crime. Defendant had writings and drawings on his person and in his backpack the day after the murder from which premeditation to kill a "Crip" could be inferred. Defendant lured the murder victim and Mr. Kizer close up by asking first if they had marijuana and then by asking to smell it. From this it can be inferred that Defendant was helping get Mr. Taylor close for the kill shots. Immediately after Mr. Taylor shot the murder victim, Defendant accompanied Mr. Taylor to the fallen Mr. Kizer, and he encouraged Mr. Taylor to shoot Mr. Kizer also. This was after three shots were fired following the murder victim being shot. From this it can be inferred that Defendant knew that Mr. Taylor was going to shoot both Mr. Kizer and the murder victim. After the murder, Defendant took the gun, wrapped it in notebook paper with gang-relating writings, and he hid the weapon in the backyard of his residence along the fence.

This proof further supports the conclusion that Defendant was criminally responsible for attempted second degree murder. As previously discussed, three shots were fired after the murder and as Mr. Kizer was running away. After Mr. Kizer fell, Defendant and Mr. Taylor stood over Mr. Kizer. Mr. Taylor pointed the gun at Mr. Kizer, and Defendant placed his hand on Mr. Taylor's hand and told him several times to shoot Mr. Kizer. Although there were some discrepancies in Mr. Kizer's testimony, he did testify at one point that Mr. Taylor pulled the trigger on the gun, but the weapon misfired.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for facilitation of first degree murder and attempted second degree murder. Defendant is not entitled to relief on this issue.

*Admission of Lyrics and Drawings Found in Defendant's Possession*

Defendant argues that the trial court erred in admitting into evidence certain rap lyrics and drawings found in his possession at the time of his arrest. More specifically, he argues that the items should have been excluded because "there was no proof presented by a handwriting expert that the defendant in fact was the person that made the writings in the notebook or that the defendant had ever acknowledged that the writings were in fact his writings." We disagree.

Generally, the admission of evidence at trial is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of evidence may only be disturbed upon a showing of an abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004)(citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Under Tennessee Rule of Evidence 401, "relevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. Rule 403 prohibits, however, the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In determining the admissibility of evidence, "the trial court must consider, among other things, the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Williamson,* 919 S.W.2d 69, 78 (Tenn.Crim.App.1995).

Tennessee Rule of Evidence 404(b) provides that evidence of other wrongs or bad acts is "not admissible to prove the character of a person in order to show action in conformity with the character trait." However, Rule 404(b) only applies to acts which reflect upon the character of the criminal accused. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002). Such evidence may be allowed "for other purposes" if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn.R.Evid. 404(b). "Other purposes" has been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227, 229

(Tenn. 1980); *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999), *perm. to appeal denied*, (Tenn. 2000). This court has held that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." *State v. Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., June 27, 2001); *See also State v. Ronald Eugene Brewer, Jr.*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566 (Tenn. Crim. App. July 14, 2011)(Material related to gangs and gang-related activity properly admitted because the State's theory was that the "rival gang affiliations of the Defendant and Josh Hinkle provided the motive for the shooting".).

At the time of Defendant's arrest in the present case, Officer Tim Reynolds searched Defendant and found a note in his front pocket containing the following handwritten lyrics:

A what u say to a [n - - - a] if he hola Crip. I tell em Blood then I hit em with them hollow tips. Hit u from ya chest up if u disrespecting us[.] I'll hit u from ya chest up hit u with some shit[] that al f[- - ]k ya hole vest up[.] Leave yo ass lookin like a chef chopped ya neck up.

The "C" in the word Crip was crossed out, which according to testimony was a sign of disrespect. There were also gang-related drawings and other writings found in Defendant's backpack. One of the drawings indicated that the drawing was done by "Ken." A piece of paper in a notebook also contained the following:

A what you say to a n [- - -] a [if] he holler crip[,] I tell em blood and I hit em wit them hollow tips[.] He holla crip [.] I hit em wit them hollow tips[.] I sunk his ship and made his whole body flip[.] But bitch n [- - - ]as they get a whole lot of lip[.] But if u get caught slippin then you out of here[.] One shot to the dome, he ain't comin back[.] BLOOD rushin out his head how you like that[.]

Defendant later told officers where he had hidden the gun used to shoot the victim. The weapon was wrapped in a piece of notebook paper with similar gang-related writings and drawings.

Prior to trial, Defendant objected to the admission of the lyrics and drawings contending that they were "highly inflammatory and prejudicial." Defendant further argued:

Some of these rap lyrics as most rap lyrics can be are extremely violent in nature, Judge. Other than being in his possession at the time of his arrest, Judge, there's no indications as to when these were written, there's no date or time allowed on them. They could have been four years old for all we know, or three years old or any amount of time before the time of the crime.

-11-

Further, Judge, they do not relate specifically towards the individual suspect - - excuse me, the individual victims in this case. There's nothing in there saying oh, I'm going to go after Mardreaus Kizer or Chauncey Partee. And I'll submit to you, Judge, that just allowing these materials in that have no direct relation to this case other than that they were in his possession [sic].

That they're filled with highly prejudicial materials as far as what they want to use them for. They're going to try to use these to say that he had premeditation to commit murder because he's writing rap lyrics that talk about murder.

And, Judge, I would just submit to you that that is highly speculative in some natures and, again, highly prejudicial and there's no bearing or relation to this crime in time frame or by victim.

The State then recited the evidence to the trial court and stated:

From the way I've described it it's hard to see any sort of motive or explanation to understand what's going on, however, when [Defendant] was arrested he had both in his pocket a note and in his backpack of school papers a variety of different papers, and many of these papers the ones the State wishes to introduce express the intent of [Defendant] - - and I'll call it almost an obsessive intent of [Defendant] if you read his writings and if you look at his pictures and things, to kill [Crips].

He identifies himself as a Blood which is the rival gang of the [Crips] and again he talks about if he sees a [Crip] he's going to kill him. In particular he talks in a couple of notes about putting a bullet in the person's head and leave them dying on the street and walking away like nothing happened.

How do we know they're [Defendant's] other than the fact they're in his possession? There's included in this - - and I've made a packet, a copy of everything. The State doesn't intend to introduce everything because there's other stuff in there that would just be highly prejudicial and inflammatory and doesn't go to the gang motive of the case.

[Defendant] has all sorts of writings that are explicitly sexual, are explicitly just violence and don't talk about [Crips] and Bloods. It's only the ones with the [Crips] and Bloods that the State thinks are relevant and we intend to introduce.

-12-

Throughout these writings we have the name Ken Parker. On its cover is a picture drawn by Ken Parker [Defendant] that says "By Ken" on it. The second page is a picture that identifies the gang that he is in which is a set of the Blood's and it bears the marking "CK" which the State through testimony will develop means "[Crip] Killer," which obviously goes to the intent and motive of [Defendant].

Throughout it is school work with [Defendant's] name on it, and dates on that school work, one even saying "Today is such and such day," that has [Defendant's] name. The dates range from August 26ᵗʰ, which is approximately two and a half weeks before this killing, three weeks before this killing, up to presumably the day of - - the day after the killing.

The trial court in reviewing the admission of the evidence under Rule 404(b) of the Tennessee Rules of Evidence made the following findings:

As far as these documents are concerned I guess you're asking me either to exclude them because they don't have any relevance whatsoever, or you're asking me to exclude them because under Rule 403 that the prejudicial effect outweighs its probative value, or you're asking me to exclude this all under 404 as proof of other crimes.

I guess I'll analyze this primarily under 404, proof of other crimes, because that's the strictest of those three standards. I have to do four things, I must determine whether or not the - - first I have to have a jury out hearing which we're doing right now.

Second I have to determine whether that evidence is relevant to a material issue other than propensity and I must state on the record that issue other than propensity and I must state on the record that issue and my ruling and the reasons for admitting that evidence. And I have to exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

And, of course, the Courts have said that you analyze this gang type of stuff under this 404(b) standard. Usually gang references are not relevant, but in this case it seems to me that it is relevant, significantly relevant, to the motive for this particular homicide.

And so I think it does have particular relevance, and I don't find that the probative values [sic] outweighed by the danger of unfair prejudice. Much of

-13-

what you talk about, [defense counsel], can be explored on cross examination and can be explored by [sic] if you want to admit other parts of the documents that were found in his possession.

But I'm finding sufficient linkage with his name all over these papers with them being found in his possession. The rest is for the jury to weigh and decide as far as all this other. Were these lyrics - - is he a member of the gang, is he not a member of the gang, who wrote these things, I think these are all things that can be argued but as far as whether it has significant probative value being found in his backpack in his possession with his name on these amongst all of his other personal papers I think it has relevance no matter who wrote it.

So I'm going to allow the State to introduce in general - - they haven't shown me specifically what they want to introduce, so you're free to object to any specific portions of this. But in the general concept of introducing some of these documents that were found in his possession at the time of his arrest I do think that that has relevance, and even under the strict standard of 404(b) should be allowed to go to this motive which is the heart of this case.

In this case, the trial court substantially complied with the requirements of Tenn. R. Evid. 404(b) and properly found that the evidence was admissible as to Defendant's motive for committing the offenses in this case, and it is also relative to Defendant's intent. It is quite clear from the record that the offenses were gang-related. It was undisputed that the victim was a member of the "Raymond Avenue" Crips gang, and Mardreaus Kizer was a "Hoover" Crips gang member. Defendant and Derek Taylor were both members of the "Bloods" gang. There was also testimony that the Bloods and the Crips were rival gangs. The rap lyrics and drawings found in Defendant's possession and the piece of notebook paper containing similar lyrics in which the gun was wrapped demonstrated Defendant's dislike of the "Crips" and a desire to harm members of the rival gang. The lyrics in one of the documents were strikingly similar to the victim's murder in this case. Although Defendant argues there was no proof that he was the author of the lyrics nor that he made the drawings, they were found among his possessions and some of the drawings indicated that they were made by "Ken." As pointed out by the State, Defendant on cross-examination fully examined Officer Reynolds about the evidence and was able to show that some items that clearly did not belong to Defendant were also in his backpack.

We conclude that the trial court did not abuse its discretion when it allowed the gang-related rap lyrics and drawings to be introduced into evidence. The State's theory at trial was that the rival gang affiliations of the Crips and Bloods provided the motive for the victim's murder and the attempted murder of Mr. Kizer. Moreover, we agree with the trial court's

findings that the probative value of the evidence outweighed the danger of unfair prejudice. Defendant is not entitled to relief on this issue.

*Election of Offenses*

Defendant argues that the State failed to elect the facts upon which it was relying to establish the offense of attempted second degree murder. We disagree. First, Defendant concedes that he failed to request an election during trial. The record further demonstrates that this issue was not raised in Defendant's motion for new trial. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that for appeals "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997)(holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). However, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. *State v. Ogle*, 666 S.W.2d 58 (Tenn. 1984).

In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *See State v. Adkisson*, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); *see also* Tenn. R. Crim. P. 52(b).

Where there is evidence at trial that the defendant has committed multiple offenses against the victim, during a time period alleged in a single count of an indictment or presentment, the doctrine of election requires the State to elect the facts upon which it is relying to establish a charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001)(citations omitted). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Id*. at 631 (citing *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)).

Because the election requirement is "fundamental, immediately touching the constitutional rights of the accused," an election of offenses is mandated whether or not the defendant requests an election. *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court even absent a request from the defendant to ensure that the

State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993).

In this case, the proof submitted to the jury did not establish more than one offense of attempted second degree murder. Therefore, the State was not required to make an election. The proof showed that three shots were fired as Mr. Kizer ran away, and then he fell down on the ground. Defendant and Mr. Taylor immediately walked up and stood over Mr. Kizer as he lay on the ground. As they stood there Mr. Taylor had the gun pointed at Mr. Kizer, and Defendant placed his hand on Mr. Taylor and told him several times to shoot Mr. Kizer. However, the gun misfired. As argued by the State, the initial shots fired and the misfire were part of a single offense. *See State v. Pelayo*, 881 S.W.2d 7 (Tenn. Crim. App. 1994)(Victim's attempt to escape did not divide the assaults into multiple crimes when defendant stabbed the victim, the victim fled, and the defendant stabbed her again.); *State v. Johnson*, 53 S.W.3d 628 (Tenn. 2001) Defendant in an assault case could not be convicted of multiple offenses for each blow struck where the entire assaults occurs in a matter of minutes.).

Since no election was required in this case, Defendant cannot show that a clear and unequivocal rule of law has been breached or that a substantial right was adversely affected. Thus, Defendant cannot establish two of the plain error factors and is not entitled to relief on this issue.

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE